Filed 11/19/20  In re D.M. CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re D.M. et al., Persons Coming Under the Juvenile Court Law. | B304508 (Los Angeles County Super. Ct. No. 18CCJP04357) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. V.M., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Martha A. Matthews, Judge.  Affirmed.

Jill Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kim Nemoy, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

_____

V.M. (mother) appeals from the juvenile court's denial without hearing of her petitions under Welfare and Institutions Code[1] section 388. Mother argues the petitions provided an opportunity for the juvenile court to correct problems with its visitation orders regarding her daughter D.M. and son M.B., and it was an abuse of discretion not to do so.

We conclude mother has forfeited her argument by not raising it below. Mother's section 388 petitions did not refer to problems with the visitation orders, or to visitation at all, and were instead based on mother's continued progress in court-ordered services and the fact that the juvenile court had recently returned the children's infant sibling to her care.

Accordingly, we affirm the orders, without foreclosing mother from raising the visitation issues with the juvenile court through an appropriate petition or proceeding.

## FACTUAL AND PROCEDURAL BACKGROUND

We limit our summary of the factual and procedural history to the information relevant to the instant appeal.

## 1.    Detention, adjudication, and disposition

On July 12, 2018, respondent Los Angeles County Department of Children and Family Services (DCFS) filed a

_____

[1] Undesignated statutory citations are to the Welfare and Institutions Code.

petition under section 300 seeking to detain 12-year-old D.M. and 10-year-old M.B. from mother and father Ma.B. (father). The petition alleged five counts based on mother's and father's substance abuse and domestic violence between mother and father.

On November 8, 2018, the juvenile court sustained all counts in the petition with amendments not relevant to this appeal.

At the dispositional hearing on November 26, 2018, the juvenile court granted reunification services to mother, but not father. At the request of children's counsel, the juvenile court issued a three-year restraining order against mother prohibiting her from contacting or coming with 100 yards of the children or their caregivers, although mother was permitted one 2-hour visit per week with the children "in the DCFS office or therapeutic setting only." The juvenile court denied father visitation, but declined to issue a restraining order against him because he was incarcerated.

Father appealed the dispositional orders denying him reunification services and visitation. We affirmed the orders in an unpublished decision. Mother did not appeal.

## 2. First review period

In a last minute information filed March 18, 2019, DCFS reported that maternal grandmother, with whom the children had been placed, was experiencing mental health issues, and DCFS was evaluating alternative placements with a maternal aunt or maternal uncle. DCFS also reported that D.M. was refusing to speak with mother, whereas M.B. stated he was "open to starting off slowly with seeing his mother only for monitored visitation once a week on Saturdays for 2-3 hours."

3

A last minute information filed April 22, 2019 indicated the children were now placed with maternal uncle D.P., and the children stated they wished to stay with him.

At a hearing that same day, children's counsel stated that the children wanted to begin having some contact with mother, and children's counsel requested that it be in a therapeutic setting. The juvenile court asked what the current visitation order was, and children's counsel stated, "There are no visits at this point." The court ordered DCFS to ensure the children were in therapy and to commence monitored visits with mother in a therapeutic setting as soon as possible.

In a status review report filed May 3, 2019, DCFS reported that mother had partially complied with her case plan, but had not completed drug treatment and had not begun visitation with the children, "because the children did not want to have visits with mother during this review period." Mother "has expressed on several occasions that she wants to have visits with the children[,] however she is waiting for them to be . . . ready to have visits with her." In March the children told the social worker they did not want to have contact with mother, but in April they expressed a desire to meet once with mother to tell her how she had made them feel and to ask her questions. Maternal uncle similarly stated that the children both had expressed that they wanted to meet with mother to tell her how she had hurt them.

Both children told the social worker that they did not want to reunify with mother. Mother wished to complete her court ordered services so she could reunify with the children.

4

Mother did not appear for four drug tests in December 2018 and January 2019. She appeared for and tested negative in five subsequent tests from February through mid-April 2019.

Mother reported that she was pregnant and due to give birth in June 2019.

In a last minute information filed May 28, 2019, the day of the status review hearing, DCFS reported that, according to the children, they had been having monitored telephone calls with mother. Maternal uncle reported that mother called the children frequently, but the children, and especially D.M., did not want to speak with her sometimes.

DCFS reported that the children were being assessed by a therapist from the Specialized Foster Care Program, Brenda S., who had been seeing them on a weekly basis and would continue to do so until they were linked with a mental health provider closer to where the children were placed with maternal uncle. Brenda S. stated that the children told her they wished to visit with mother to talk about how she made them feel. Brenda S. said the visits would have to be in a therapeutic setting because the children "appear to have a lot of anger and frustration as to their parents." DCFS stated that children and mother would begin monitored visits "once the children are linked to a mental health provider and the therapist has made this recommendation."

### 3. First review hearing

At the status review hearing on May 28, 2019, the juvenile court ordered continued services for mother. Children's counsel stated that M.B. wanted a visit with mother, and requested that DCFS work with mother to arrange a monitored visit with M.B.

5

at a DCFS office.  D.M., however, was not ready for a visit with mother.

The court expressed concern that, although DCFS initiated the process to get the children into therapy a year earlier, the children had yet to begin therapy.  Children's counsel agreed that "it didn't happen" and "the ball got dropped."  The juvenile court ordered that DCFS get the children into therapy and, once that relationship was established, work with the therapist and with mother to have contact between mother and the children, either in person or by telephone or videoconference.  The court stated, "I understand the children are reluctant to have contact with their mother, which is kind of understandable, given everything they've been through, but it can be really important to have whatever reconciliation take place with the aid of a therapist."

### 4.    Second review period

In a status review report filed July 1, 2019, DCFS reported that mother was in partial compliance with her case plan, and had completed a parenting class and was drug testing.  She had not completed a drug treatment program, individual therapy, or domestic violence class, and had not begun monitored visitation with the children.  Mother continued to test negative in four tests from April through early June 2019.

Mother gave birth to a boy in June 2019.  DCFS had received a referral regarding the child after mother refused to talk to the hospital social worker, and the referring party learned that mother's other children were in dependency proceedings.  DCFS was following up on the referral.

D.M. stated that she did not trust mother or wish to reunify with her, and wanted to meet with her only once to tell her how she felt.  M.B. similarly stated he wished to meet with mother

once to tell her how he felt, but did not want to reunify with her. He shared with the DCFS social worker "a lot of recollections of neglect . . . when he was with his mother such as mother leaving him and his sister in a shed when it was really hot." Both children stated they wanted maternal uncle to adopt them.

Therapist Brenda S. continued to recommend that any visits be in a therapeutic setting "in order to provide emotional support and attempt to de-escalate[ ] dysregulated emotions immediately." Brenda S. said M.B. "has a lot to say about the neglect that he en[d]ured with mother."

Both children had been linked with mental health services in Ontario. D.M. had her first therapy session on June 26, 2019, and M.B.'s first session was scheduled for July 1, 2019.

Because mother was only in partial compliance with her case plan, and had yet to begin individual therapy, drug treatment, or a domestic violence program, DCFS recommended the juvenile court terminate reunification services.

In a last minute information filed July 26, 2019, DCFS reported D.M.'s therapist did not have the facilities for visits with mother in a therapeutic setting, and recommended family therapy instead, "due to the trauma that the child has disclosed." The therapist said those sessions could begin "once the therapists developed a therapeutic plan with the child and the child is ready to start family therapy." DCFS reported that family therapy would begin "once deemed appropriate by the children's therapists." (Italics omitted.) M.B.'s therapist also recommended that meetings with mother "occur in a family therapeutic setting."

Mother informed DCFS that she was on the waitlist for mental health services and had enrolled in a domestic violence

program, the latter of which DCFS confirmed by telephone with the facilitator of the program.

On July 26, 2019, the juvenile court continued the status review hearing. The court stated that there was "a substantial possibility" that it would terminate reunification services as recommended by DCFS because "it honestly doesn't seem like the relationship between these children and their mother can be repaired at this point." The court acknowledged, however, that mother's having recently given birth impeded her ability to make progress on her case plan, and that the previously ordered visits in a therapeutic setting had yet to occur.

The juvenile court ordered DCFS to work with the children's therapists to arrange at least two sessions of family therapy, and to provide a report on the sessions. The court stated that the "critical issue is where everyone is after they've actually had an opportunity to participate in therapy together."

In early August 2019, DCFS initiated proceedings to detain mother's newborn son, M.M. The detention report described an incident in early July 2019 in which mother got into a dispute with the manager of her transitional housing complex. Mother pushed the manager to the ground and pulled her hair while mother's boyfriend punched her.

In a last minute information filed August 28, 2019, DCFS reported that it had consulted with the children's therapists regarding the juvenile court's order of two sessions of family therapy. Both therapists had recommended against family therapy; D.M.'s therapist said she was still working with D.M. to "process her trauma," and M.B.'s therapist wanted more time to "prepare him for family therapy."

At the therapists' suggestion, the DCFS social worker held a child and family teaming meeting attended by mother, the children, their therapists, maternal uncle, and a maternal aunt and maternal cousin. "[I]deas that were brainstorm[ed] in order to meet the family needs" included that the children continue to attend therapy "to process their feelings and . . . past trauma," that they have monitored phone calls with mother twice a week, and that mother continue to attend her court ordered services "and to apply what has been learned during phone calls in order to be able to reunify with her children."

Maternal uncle reported that mother had unmonitored communication with the children through social media. Mother also had texted maternal uncle and accused him of wanting to take her children away from her. Maternal uncle was worried that mother was going to retaliate against him in some way.

Mother did not appear for a drug test in August, and informed DCFS it was because her drug testing referral had expired. DCFS submitted a new referral. Mother tested negative on her three subsequent tests, through early August.

Mother reported that a drug treatment facility had informed her she did not qualify for services, but was assessing whether it could provide aftercare to mother. Mother also reported she was attending Narcotics Anonymous meetings and her domestic violence course. Mother said she was still on the waitlist for mental health services. DCFS continued to recommend termination of reunification services.

## 5.     Second review hearing

The juvenile court held a hearing on August 28, 2019. First, it adjudicated baby M.M.'s section 300 petition, sustaining allegations regarding mother's and father's substance abuse.[2]

The juvenile court then heard argument as to whether to terminate mother's reunification services in regard to D.M. and M.B.  Mother's counsel noted mother's case plan progress and the obstacles she faced in making that progress, including recently giving birth and having been incarcerated at the beginning of the proceedings.  Mother's counsel also raised the issue that, "given ample attempts to start visits in a therapeutic setting," those visits had not taken place, although mother had maintained telephone contact and tried to have videoconferences with the children.  Mother's counsel requested more time for mother to complete services and have at least one visit in a therapeutic setting.

The juvenile court stated that "mother has completed quite a bit of her case plan and is testing negative, and this is one of those cases [in] which the Courts of Appeal have warned the trial courts that a child's reluctance to visit or therapists not recommending visits or conjoint counseling should not be allowed to sabotage reunification . . . ."  The court asked DCFS to address this in its argument.

DCFS counsel responded that the lack of visitation was not the sole basis for the recommendation to terminate services. Counsel argued that mother's case progress was very recent, and

---

[2] The juvenile court found that father was M.M.'s alleged father, pending a paternity test or voluntary declaration of parentage.

she continued to display aggressive behavior as demonstrated by the incident with the transitional housing manager the previous month.[3]

Children's counsel similarly argued that mother's case progress was recent, and that the therapists' recommendation that the children were not ready for family therapy was "indicative of the amount of trauma that they went through."

The juvenile court then ruled that it had no basis to continue reunification services given mother's long delay in beginning her programs, and particularly a domestic violence program. The court praised mother for her progress but nonetheless terminated further services in regard to D.M. and M.B. The court set a section 366.26 permanency planning hearing for December 2019.

The juvenile court declined to order further visitation "unless and until the children's therapists indicate that visitation would be helpful to them. I think they just need time at this point and shouldn't be pressured to visit." Children's counsel noted M.B. wanted one visit with mother, perhaps at a DCFS office, and the court stated, "That's fine. Any visits that the children's therapists believe would be appropriate, [DCFS] is to work with mother to set up. I just don't want the children to be pressured to do ongoing visitation given . . . that hasn't been working out that well." The court noted mother's objection to termination of services and denial of further visitation.

The record does not indicate that mother sought appellate review of the juvenile court's August 28, 2019 orders.

---

[3] The detention report detailing the attack on the transitional housing manager was admitted into evidence at the August 28, 2019 hearing.

11

## 6. Mother's section 388 petitions

DCFS filed a section 366.26 report on November 25, 2019. The children were continuing to see their therapists. They had not visited with mother, and stated they did not wish to do so. Mother reached out to them via social media, but they ignored her, and they did not write back in response to birthday cards she sent them.

DCFS recommended adoption by maternal uncle as the permanent plan. Because of an unresolved criminal charge in Texas against maternal uncle's girlfriend, however, DCFS had not obtained a resource family approval assessment of maternal uncle's home.[4] DCFS recommended a 120-day continuance for the home assessment matter to be resolved.

On December 16, 2019, pursuant to section 388, mother filed two JV-180 forms requesting the juvenile court change its orders terminating mother's reunification services as to D.M. and M.B. On the forms, mother stated, "Mother has been consistently testing negative for all substances since August 2019 . . . , and Mother has finished eight (8) sessions of Domestic Violence Classes . . . . In addition, the court returned the [children's] half sibling, [M.M.], to the custody of the Mother on December 10th, 2019 . . . ." Mother requested that the juvenile court reinstate reunification services and take the section 366.26 hearing off calendar.

---

[4] The girlfriend was arrested in Texas in 2018 on a marijuana charge, but Texas law enforcement had taken no further action. The girlfriend had hired an attorney and was attempting to clear her record in Texas with evidence that she had multiple sclerosis and the marijuana was for medicinal purposes.

12

As for why the change of order would be in the children's best interest, mother stated that she was "the [children's] biological mother, a parent is the most permanent plan for a child[,] and [the children] should have an opportunity to foster a relationship with the half sibling, [M.M.], since [M.M.] is flourishing well in the custody of the Mother and sibling relationships are intrinsically significant."

Mother attached documentation showing negative drug tests from August through November 2019, a notification of participation in programming, and a December 10, 2019, minute order indicating the juvenile court placed M.M. with mother on condition that mother reside with maternal grandmother and continue her progress with her case plan.

At a hearing on December 19, 2019, the juvenile court granted DCFS's requested continuance for the home assessment, and asked for argument as to whether to set an evidentiary hearing on mother's section 388 petitions. Children's counsel argued that D.M. and M.B. were "differently situated" than infant M.M. in that they did not want to reunify or visit with mother, and were stable in their current placement. Children's counsel contended that it would not be in their best interest to reinstate the reunification process. DCFS counsel agreed.

The juvenile court stated that it was inclined to deny the section 388 petitions without a hearing, because "sometimes so much has happened to a child that it would actually harm the child for there to be any question about what is going to happen in the future, and these children have finally found stability with their uncle." The court noted that "as recently as August of this year, the children's therapists were still staying the children were too fragile" for therapy sessions with mother. The court

further noted the evidence that mother was sending hostile text messages to maternal uncle.

Mother's counsel argued mother had shown changed circumstances, and establishing a bond with M.M. was in the older children's best interest. The juvenile court agreed mother "would be able to make a showing of changed circumstances," but that nonetheless it would not be in the older children's best interest to reopen the case in the manner mother requested.

The juvenile court denied the section 388 petitions without an evidentiary hearing. Mother timely appealed.

## APPLICABLE LAW AND STANDARD OF REVIEW

Under section 388, subdivision (a)(1), a parent of "a dependent child of the juvenile court" may, "upon grounds of change of circumstance or new evidence," petition the juvenile court "for a hearing to change, modify, or set aside any order of court previously made . . . ." The juvenile court must hold the hearing "[i]f it appears that the best interests of the child . . . may be promoted by the proposed change of order . . . ." (*Id.*, subd. (d).)

"A petition for modification must be liberally construed in favor of its sufficiency." (Cal. Rules of Court, rule 5.570(a).) However, the juvenile court may deny a section 388 petition without a hearing if the petition "fails to state a change of circumstance or new evidence that may require a change of order or termination of jurisdiction or fails to show that the requested modification would promote the best interest of the child . . . ." (Cal. Rules of Court, rule 5.570(d)(1).)

We review the juvenile court's decision to deny a section 388 petition without a hearing for abuse of discretion. (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1158.)

14

## DISCUSSION

Mother's argument on appeal is based on what she contends is the juvenile court's failure to ensure she received adequate visitation during the reunification period, and the juvenile court's "inappropriate delegation of authority" to the children's therapists to determine whether to grant visitation following termination of services. Mother catalogues the instances summarized above in which the juvenile court ordered in-person visitation or family therapy throughout the proceedings, none of which occurred. Mother asserts that her section 388 petitions provided an opportunity for the juvenile court to remedy the lack of visitation, and it was an abuse of discretion not to do so.

Generally speaking, a juvenile court ordering reunification services must provide for visitation between the parent and child "as frequent[ly] as possible, consistent with the well-being of the child." (§ 362.1, subd. (a)(1)(A).) Even after termination of services, the juvenile court "shall continue to permit the parent or legal guardian to visit the child pending the hearing unless it finds that visitation would be detrimental to the child." (§ 366.21, subd. (h).) "The power to determine the right and extent of visitation by a noncustodial parent in a dependency case resides with the court and may not be delegated to nonjudicial officials or private parties." (*In re T.H.* (2010) 190 Cal.App.4th 1119, 1123.)

We need not decide whether the juvenile court's visitation orders or the manner in which it enforced them was proper, because mother has forfeited those arguments by failing to raise them below. Her section 388 petitions said nothing about problems with visitation or the need for the juvenile court to

15

remedy any such problems.  Instead, her petitions were based on her negative drug tests, continued progress in her case plan, and the fact that the juvenile court had placed M.M. in her care six days earlier.  When arguing in favor of an evidentiary hearing on the petitions, mother's counsel similarly emphasized mother's changed circumstances, without referencing visitation.  Nothing in the petitions or in the argument of counsel concerning the petitions mentioned visitation at all, much less particular problems with the substance or enforcement of visitation orders.

Because the petitions did not raise the issue of visitation, the juvenile court was denied the opportunity to address the arguments mother makes in this appeal.  Those arguments therefore are forfeited.  (*In re A.B.* (2014) 225 Cal.App.4th 1358, 1366 [" 'As a general rule, a party is precluded from urging on appeal any point not raised in the trial court.' "].)  A court does not abuse its discretion by failing to address a problem that has not been brought to its attention.  (*Ibid.* [" 'A party on appeal cannot successfully complain because the trial court failed to do something which it was not asked to do . . . .' "].)

Mother argues that the juvenile court was well-aware of the problems with visitation, as indicated by its discussions with counsel on the subject throughout the proceedings.  The juvenile court's general awareness of issues with visitation does not impose upon it a duty to infer that its visitation orders are the subject of a section 388 petition that does not mention those orders.

Mother relies on *In re Hunter S.* (2006) 142 Cal.App.4th 1497 (*Hunter S.*), but it is inapposite.  In *Hunter S.*, the mother filed a section 388 petition asking the juvenile court to vacate the permanency planning hearing and reinstate reunification

services "to allow her to actually partake of visitation she had been granted but never received." (*Id.* at p. 1506, fn. 5.) The juvenile court denied the petition as not being in the best interest of the child, given a lack of contact or current bond between mother and child. (*Id.* at pp. 1503–1504, 1507.)

Our colleagues in Division Eight reversed. (*Hunter S.*, *supra*, 142 Cal.App.4th at p. 1500.) The appellate court concluded that the juvenile court had failed to enforce its visitation order by leaving it to the child and the child's therapist to decide whether visitation would occur, which as a practical matter resulted in no visitation at all. (*Id.* at p. 1505.) Having failed to ensure visitation occurred, the juvenile court abused its discretion by denying the section 388 petition on the basis that the mother had not had sufficient contact with the child. (*Id.* at p. 1507.)

*Hunter S.* involved a section 388 petition that "brought to the court's attention" the "failure to enforce the [visitation] order." (*Hunter S.*, *supra*, 142 Cal.App.4th at p. 1506.) In other words, the petition squarely placed the issue of visitation before the juvenile court. Forfeiture, therefore, was not an issue, as it is in this case. Accordingly, *Hunter S.* is not instructive. We express no opinion as to the applicability of *Hunter S.* absent mother's forfeiture.

Mother suggests that visitation issues are intrinsic in the "best interest" analysis of a section 388 petition, because "the best interests of the children involve visitation with their parent unless it is detrimental to their wellbeing." Mother contends statements by the juvenile court establish it also believed in-person contact between mother and the children was in the children's best interest. Regardless, it was incumbent on mother

expressly to bring the issue of visitation to the juvenile court's attention in her section 388 petitions.  Because she did not do so, the juvenile court did not abuse its discretion in failing sua sponte to raise that issue as part of its "best interest" analysis.

Mother raises no other arguments to challenge the juvenile court's denial of her section 388 petitions.  We therefore have no basis to reverse.  (*In re J.F.* (2019) 39 Cal.App.5th 70, 79 ["The juvenile court's orders are 'presumed to be correct, and it is appellant's burden to affirmatively show error.' "].)  In so holding, we do not foreclose mother from raising the issue of visitation with the juvenile court through an appropriate petition or proceeding.  We express no opinion as to how the juvenile court should rule if mother does so.

## DISPOSITION

The orders denying mother's section 388 petitions are affirmed.

NOT TO BE PUBLISHED.

                                        BENDIX, Acting P. J.

We concur:


CHANEY, J.


FEDERMAN, J.*

---

\* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.